## LIVINGSTON MIMS v. JOHN ARMSTRONG.

1. LAWS OF NATIONS: INTERCOURSE BETWEEN BELLIGERENTS. — During the existence of war between independent nations, all communication, correspondence, and intercourse between the citizens of the belligerent powers, except such as may be warlike in its character or licensed by the sovereign power, must absolutely terminate; all contracts and agreements between

citizens of one of the belligerent powers with those of the other, are illegal and void. Wheaton's Int. Law, by Lawrence, 551–556; 15 Johns. 56; 16 ib. 438; 5 Wallace, 405; 6 ib. 531–535.

2. SAME: SAME: AS BETWEEN UNITED AND CONFEDERATE STATES DURING THE REBELLION. — The principle of international law, forbidding all intercourse between the citizens of independent nations during the existence of war, is applicable to the recent civil war between the United States and Confederate States; and all contracts entered into between the citizens of the different belligerents during the war are illegal and void, unless licensed or permitted by the President of the United States.

3. SAME: CASE IN JUDGMENT — In August, 1862, and while the city of New Orleans, La., was in possession of the Federal troops, A., a citizen of New Orleans, La., through O., his agent, loaned Confederate money at the city of Jackson, Miss., to M., a citizen of Mississippi, and took from M. a mortgage on real estate to secure its payment. Bill filed by A. to foreclose the mortgage. *Held* — That the contract was illegal and void, because all intercourse between A. and M. was forbidden by the law of nations and by the Act of the Congress of the United States of July 13th, 1861, and the proclamation of the President.

APPEAL from the Chancery Court of Hinds county. Hon. John Watts, chancellor.

The facts of the case will be found in the opinion of the court.

*W. & J. R. Yerger*, for appellant, argued :

That the loan of the Confederate notes was illegal and void, and was in direct violation of the public policy of the United States ; that they never did, nor could, amount to a legal consideration, for they were issued in support of, and furtherance of, the rebellion which was carried on to overthrow the power and authority of the United States.

This loan of Confederate notes, as between appellant and appellee, was in violation of the general law of war prohibiting intercourse between belligerents, and particularly in violation of the Act of 13th July, 1861, and the proclamation of the President in pursuance thereof.

It is admitted that contracts made for " Confederate money," between citizens of the rebel States, will be upheld, *if executed.*

Livingston Mims *v.* John Armstrong.

But the facts in this case admit of no application of these decisions.

After the occupation of New Orleans, in May, 1862, it lost its identity with the rebellion, returned to its allegiance to the Government, toward which it occupied the same attitude as it did previous to the war; and from thenceforth was as much within the jurisdiction and authority of the United States Government as the State of Illinois. As these Confederate notes were issued for an unlawful purpose, for the promotion and maintenance of domestic strife and treasonable designs, they, of course, can form no legal basis for contracts; and, *a fortiori*, contracts made for such a consideration, between residents of the rebel States and citizens residing within the lines of the United States army, are not only null and void, but seditious, and in direct violation of the laws of the land, and surely the courts of the country will not enforce such contracts: the record in this case presents such a one. While the United States Government accorded to the people in rebellion the rights of belligerents, it never once regarded the pretended Confederacy as a separate independent power or nationality. In support of the foregoing, we would refer to the opinion of the Judge-Advocate General, in a case adjudicated in Tennessee during the rebellion. See Digest of Opinions of Judge Advocate General, p. 58; the case of *The Venice,* 2 Wallace, p. 258; *United States* v. *Rice,* 4 Wheat. 246; 4 Curtis, 391; 9 Cranch. 191; 3 Curtis, 327; 1 Kent's Com. 8th ed., 76; 2 Black. 687; 3 Wallace, 617.

But since the pendency of this suit there have been two decisions, which settle conclusively this case in favor of the appellant. *Vide Hanger* v. *Abbott,* 6 Wallace, 531; " *The Ouachita Cotton,*" 6 Wallace, 521. The counsel for the appellee seek to evoke the rule that parties *in pari delicto* will not be relieved, which is no way applicable to this case; that rule is generally applied to executed contracts.

When a person is entitled to resist an illegal contract, and seeks to recover the money back, in such cases, where he becomes *an actor*, and asks the aid of a court, the courts have generally

laid down the rule, —that both parties being *in pari delicto*, they will not come to the help of either; applying to the plaintiff the rule, *Potior est conditio defendentis*. 2 Kent's Com. 8th ed., 600. When the active assistance of a court is sought to enforce an illegal contract, the maxim, *Ex turpi causa non oritur actio*, applies. And see fully 2 Kent's Com. 8th ed., 599; *Halman* v. *Johnson*, Cowper's Rep. 343; *Mackey* v. *Broomfield*, 13 Serg. & Rawle, 341–2; *Griswold* v. *Waddington*, 16 Johns. 486; *Josephus* v. *Preber*, 3 Barn. & Cress. 639; 2 Peters' Rep. 539.

Even where a transaction is against public policy, a court of equity will order a bond or other instrument emanating from such contract or transaction to be delivered up and cancelled, at the instance of the party who made it, although he be *in pari delicto* with the defendant. Hill on Trustees, 163–4; *St. John* v. *St. John*, 11 Vesey, 535; *Regnel* v. *Sprye*, 1 De G. 660. and this even where the conveyance is executed.

*T. J. & F. A. R. Wharton* for appellee.

There is not a question presented by the record in this case, or in the argument of opposing counsel, which has not received the solemn and well-considered adjudication of the Supreme Court of this State.

There can well be no case to which the maxim *stare decisis* could be more appropriately applied than this one.

It is wrong to agitate such questions, after they have been solemnly adjudicated; for it involves the political quietude of the country, as well as disturbs settled principles of law. *Interest reipublicae ut sit finis litium*.

In support of our views of this question we refer to *Green* v. *Sizer*, 40 Miss. 530, where the whole doctrine on the points involved in this suit is clearly elucidated; and *Orchard* v. *Hughes*, 1 Wallace, 73; 40 Miss. 574; *Armstrong* v. *Toler*, 11 Wheat. 258.

The various authorities cited by adverse counsel, as we conceive, do not conflict with the above, but if properly construed, they will be found to harmonize.

JEFFORDS, J., delivered the opinion of the court.

This is a bill in Chancery, filed by Armstrong, the appellee, against Mims, the appellant, to foreclose a mortgage executed by Mims to one Robert Oliver on the 16th day of August, 1862.

The mortgage was given to secure the payment of a note for ten thousand dollars for money loaned, payable at the expiration of two years from the date of said note and mortgage.

It appears from the testimony that Oliver was acting as the agent of Armstrong in the matter; that the money loaned was "Confederate notes," and belonged to Armstrong; that the transaction took place at the city of Jackson, in the State of Mississippi; and that at the time it occurred, both Oliver, the agent, and Armstrong, the principal, resided in the city of New Orleans, in the State of Louisiana; and that Mims was a resident of the city of Jackson, State of Mississippi aforesaid.

At the November Term, 1867, the court below pronounced its decree in favor of the complainant, Armstrong, thereby foreclosing the equity of redemption in the mortgaged premises as against Mims; and also at the same time decreeing that Mims should pay or cause to be paid to Armstrong the sum of five thousand two hundred and sixty dollars, that being the amount ascertained to be due, within thirty days from the date of the decree, and in default thereof that the mortgaged premises should be sold to pay the same. To reverse which decree, this appeal is now prosecuted.

Two questions are presented by the record and arguments of counsel in this case for the consideration of the court.

It is insisted that the decree of the Chancery Court should be reversed: First, because the loan to Mims of "Confederate notes or money" was illegal and void, in violation of the public policy of the United States, tended to encourage the rebellion, and gave aid and comfort to the enemies of the United States, and can give no standing to any one in court to enforce a breach of contract of such loan.

Second: Whether a loan of "Confederate notes" was *per se* illegal or not, still the contract cannot be enforced in this

28

case; it violated the general law of war, prohibiting intercourse between belligerents, and particularly violated the act of July 13, 1861, prohibiting intercourse between citizens of the loyal States and the inhabitants of the rebel States, and the proclamation of the President in pursuance thereof.

We will proceed to the consideration of these questions by inverting the order in which they are here stated, as the determination of the second proposition must dispose of this entire controversy.

There is, perhaps, no general rule of law more clearly and definitely established — one which is more rigorously adhered to, admitting of fewer exceptions — than the one now under consideration.

When war becomes *flagrant*, all communication, correspondence, and intercourse between citizens of the respective belligerent powers, except such as may be warlike in its character, or such as has been licensed or permitted by the sovereign power, must absolutely terminate and cease.

Every transaction having any connection with, or reference to, trade or commerce, whether of a private or public nature — all undertakings, promises, agreements, and contracts between citizens of one of the belligerents with those of the other — are clearly illegal and void, unless brought within the exception just stated.

Whenever it is made to appear that enemies have been trading or contracting with each other, the law of war strikes down and puts an end to all engagements made under such circumstances.

So stringent is the rule, that all attempts at shuffling or evasion have utterly failed. It matters not what may have been the medium of communication, whether proximate or remote, direct and personal, as between principal and principal, or through the intervention of an agent, as in the present instance, or otherwise; the fact being established, it is always attended with the same fatal result.

All writers and authorities concur in this view. In fact there is no conflict on this subject. Wheaton on Int. Law, by Law-

rence, 551–556; 15 Johnson, *Griswold* v. *Waddington*, p. 56; same case, 16 Johnson, 438; 5 Wallace, 405; 6 Wallace, 531, 535.

We have stated the rule as applicable to independent nations engaged in a public war. It has, however, been repeatedly held by the Supreme Court of the United States that this rule was equally applicable to the belligerent parties engaged in the recent civil war in this country.

The Act of Congress of July 13, 1861, and the proclamation of the President in pursuance thereof, did not establish any new rule on this subject. These were but declaratory and cumulative. See case of *The Venice,* 2 Wallace, 258; *The Ouachita Cotton,* 6 Wallace, 531.

Armstrong being a resident of New Orleans, in the State of Louisiana, within the Federal lines, and Mims being a resident of Jackson, in the State of Mississippi, which was within the Confederate lines at the time of the execution of the note and mortgage sued on, this case is brought clearly within the rule as laid down in repeated decisions of the Supreme Court of the United States.

There is no pretence that the parties in this case acted under a license or permission from the President.

The " sting of disability " having attached to the note and mortgage now before the court, and " prohibition being the rule and license the exception," the penalty incurred for unlawful and prohibited intercourse between enemies must be pronounced by this court, by declaring this note and mortgage null and void.

Having arrived at this conclusion, we are relieved from the necessity of passing upon the remaining question presented by the record.

The decree of the court below is reversed, and bill dismissed at the costs of the appellee.